**Sandra S. Park\*\***
**Lenora Lapidus\*\***
**Michaela Wallin\*\***
**ACLU Women's Rights Project**
**125 Broad Street, 18th Fl.**
**New York, NY**
**Telephone: (212) 519-7871**
**Email: spark@aclu.org**
**llapidus@aclu.org**
**mwallin@aclu.org**
**\*\*Pro hac vice application forthcoming**

**Heather Macre (Bar No. 026625)**
**Aiken Schenk Hawkins & Ricciardi P.C.**
**2390 East Camelback Road, Suite 400**
**Phoenix, Arizona  85016-3479**
**Telephone:  (602) 248-8203**
**E-Mail:  ham@ashrlaw.com**

**Daniel J. Pochoda (Bar No. 021979)**
**Victoria Lopez (Bar No. 330042)\*\***
**Joel Edman (Bar No. 031324)**
**ACLU Foundation of Arizona**
**3707 North 7th Street, Suite 235**
**Phoenix, AZ 85011-0148**
**Telephone: (602) 650-1854**
**Email: dpochoda@acluaz.org**
**vlopez@acluaz.org**
**\*\*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)**
Attorneys for the Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| NANCY MARKHAM,<br><br>                    Plaintiff,<br><br>          v.<br><br>CITY OF SURPRISE; MICHAEL FRAZIER in his individual and official capacities, and CHRISTOPHER TOVAR, in his individual capacity,<br><br>                    Defendants. | No.<br><br>**COMPLAINT** |

1

**INTRODUCTION**

1.      Plaintiff Nancy Markham, a resident of Surprise, Arizona, was a victim of repeated domestic violence and needed to contact and rely on the Surprise police for protection and assistance at her rental home. In response, Defendants sought Ms. Markham's eviction.

2.      Defendants – City of Surprise ("Surprise"), Surprise chief of police Michael Frazier and Surprise police officer Christopher Tovar – have enacted or enforced laws that require landlords to take action against tenants when police are called or respond to crime at a rental unit, even if the tenant was not involved in or responsible for the crime, and impose penalties if landlords fail to take such action.

3.      The laws in question include Chapter 105, Article III of the Surprise Municipal Code §105-104, which defines nuisance properties and authorizes officials to impose penalties on the property owner if the nuisance is not abated ("the Nuisance Property Section") and §105-106, which requires the adoption of crime free lease provisions that entitle landlords to evict tenants upon a single occurrence of any criminal activity ("the Crime Free Lease Section"). Hereinafter these two sections will be referred to as the Surprise "Nuisance Policy."

4.      Under Surprise's Nuisance Policy, nuisance offenses include four or more calls for police service or commission of two crimes at a property that the tenant allegedly "allows," even if the tenant called to report and deter her attacker or was the victim of the criminal conduct. *Surprise Municipal Code §105-104.*

5.     The Nuisance Policy requires that landlords be authorized to pursue evictions on this basis and authorizes the city to impose penalties if landlords fail to do so. *Surprise Municipal Code §§105-106, 105-104(c)(3).*

6.     The Nuisance Policy has the effect of encouraging landlords to take steps before the Nuisance Property Section is even triggered and evict any tenant who arguably engages in the prohibited behaviors, such as by calling the police a single time to report a crime committed against her, or because of a crime occurring at her unit even if the tenant had no involvement.

7.     In materials promoting the Nuisance Policy to landlords and the public, Surprise anticipated and advertised that the Nuisance Property Section and Crime Free Lease Section would work in tandem to significantly deter calls to police.

8.     Surprise enacted the Nuisance Policy – both the Nuisance Property and Crime Free Lease Sections – in 2010. *Ord. No. 2010-01 §2, 6-24-2010.*

9.     At the time of passage, the Surprise City Council was warned about the likely negative impact of the Nuisance Policy on domestic violence victims, the majority of whom are women. Community stakeholders, including the Chair of Surprise's Quality of Life Commission, raised the concern that this policy could be enforced against domestic violence victims on the basis of crimes committed against them and the resulting calls to police.

10.     Despite knowing these predicted results, Surprise adopted the current Nuisance Policy, thereby increasing the vulnerability of domestic violence victims to eviction and deterring their use of an important means for protection – calls to law enforcement.

475486.1

11.     Housing security and access to police assistance are often essential to domestic violence victims' ability to escape life-threatening violence and live free from abuse.  Yet, domestic violence victims continue to face barriers to reporting the abuse to law enforcement.  In addition, domestic violence is a primary cause of homelessness for women and their children.

12.     Reforms adopted by federal, state, and local governments over the last thirty years have focused on supporting victims' ability to reach out to law enforcement for assistance and to obtain and maintain secure housing.

13.     The Nuisance Policy ignores the needs of victims of domestic violence, the overwhelming majority of whom are women, empowers abusers to act without fear of police intervention and increases victims' vulnerability to both homelessness and future violence by pressuring landlords to remove them from housing.

14.     As set out below in the Facts section, the actions taken by Defendants against Ms. Markham illustrate the danger of the Surprise Nuisance Policy.  In addition to the repeated domestic violence and physical abuse that she suffered, Ms. Markham and her children faced the loss of their rental home through the operation of the Nuisance Policy and its aggressive enforcement by Defendant Frazier, Defendant Tovar and the Surprise Police Department.

15.     Defendants' actions violated and continue to threaten Ms. Markham's fundamental federal constitutional rights.  The Surprise Nuisance Policy and its enforcement infringe on Ms. Markham's right under the First Amendment to freedom of speech and to petition her government and disregard the Fourteenth Amendment's requirements of due

4

process and equal protection.  Defendants similarly violated the Arizona State Constitution's equivalent protections of freedom of speech, the right to petition, due process, and equal protection.

16.     Defendants' policies and practices also violate or conflict with the federal Fair Housing Act's prohibitions against discrimination, Arizona Fair Housing Law A.R.S. §41-1491, and additional Arizona tenant protections, such as A.R.S. §33-1315(A)(4), which provides that no rental agreement may "waive or limit the tenant's right to summon or any other person's right to summon a peace officer or other emergency assistance in response to an emergency." *A.R.S. §33-1315(A)(4).*

17.     Ms. Markham brings this action seeking damages for injuries suffered by Defendants' unconstitutional and unlawful enforcement of the Nuisance Property and Crime Free Lease Sections and to enjoin Defendants from enforcing these provisions in the future. The presence and enforcement of the Nuisance Policy continues to chill Ms. Markham's ability to contact law enforcement and require her to choose between calling for police assistance – even in emergencies – and keeping her present home.

18.     This action is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §3601 *et seq.*

19.     Ms. Markham seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343(3) and (4).

475486.1

21.     This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367.

22.     Declaratory relief is authorized by 28 U.S.C. §2201 and Federal Rule of Civil Procedure 57.

23.     Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

24.     This Court has personal jurisdiction over Defendants because they are located or reside in the District of Arizona and the events that give rise to this action occurred within the District of Arizona.

25.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. §1391(b) in that Defendants are subject to personal jurisdiction within the District of Arizona and/or the events that give rise to this action occurred within the District of Arizona.

**PARTIES**

26.     Ms. Markham is a single mother of two sons, one of whom is a minor.  She and her sons live in Surprise, Arizona.  Ms. Markham has lived in Surprise for eleven years and intends to remain in Surprise.

27.     From March 1, 2013 until February 28, 2015, Ms. Markham lived at 15526 West Ocotillo Lane in Surprise (hereinafter "the Property").

28.     Ms. Markham currently rents another home in Surprise.

29.     Defendant Surprise is a municipal corporation, having the name of "City of Surprise," located in Maricopa County, in the State of Arizona, with administrative offices located at 16000 N. Civic Center Plaza, Surprise, AZ 85374 and police headquarters located at 14250 W. Statler Plaza, Suite 103, Surprise, AZ 85374.

6

30.     Arizona cities derive their legislative powers either from state law or from their own charters. Surprise does not have a charter and possesses only that legislative power authorized by state law and the Arizona Constitution.  Surprise must be able to point to a delegation in state law to support its legislative enactments.

31.     Defendant Michael Frazier is the Chief of the Surprise Police Department and, in that position, has responsibility for, among other things: overseeing the operations of police officers in their official duties; enforcing the Nuisance Policy, including determining whether a call to police or other activity at a property is a "nuisance offense;" notifying landlords and other involved parties of alleged nuisance offenses at a property; and directing landlords and other involved parties to act against the tenant to abate the designated nuisance or face penalties imposed by Surprise. He is the final decision maker for Defendant Surprise in the area of law enforcement.

32.     Defendant Frazier maintains an office at 14250 W. Statler Plaza, Suite 103, Surprise, AZ 85374.

33.     Defendant Christopher Tovar is a Police Officer in the Surprise Police Department and, in that position, has responsibility for, among other things, enforcing the Nuisance Policy, including determining whether a call to police or other activity at a property is a "nuisance offense;" notifying landlords and other involved parties of alleged nuisance offenses at a property, and instructing landlords and other involved parties to act to against the tenant to abate the designated nuisance or face penalties imposed by Surprise.

34.     Defendant Tovar maintains an office at 14250 W. Statler Plaza, Suite 103, Surprise, AZ 85374.

475486.1

35.     Each of the individual defendants is a "person" as defined in 42 U.S.C. §1983, and at all relevant times acted under the color of state law.

36.     Defendant Frazier is sued in his individual and official capacities.

37.     Defendant Tovar is sued in his individual capacity.

## FACTS

### A. The Nuisance Policy

38.     Defendants adopted, maintain and enforce the Nuisance Policy, Chapter 105, Article III §§105-104 (the Nuisance Property Section) and 105-106 (the Crime Free Lease Section) of the Surprise Municipal Code, against landlords and tenants with the aim of "providing for accountability of property owners for slum conditions and criminal conduct." *Surprise Municipal Code §105-91.*

39.     Surprise Municipal Code Chapter 26, Article II §26-20 requires landlords to obtain business licenses for each property that a landlord desires to rent to tenants in Surprise.

### The Nuisance Property Section

40.     The Nuisance Policy includes the Nuisance Property Section, §105-104, which declares a property a nuisance upon the occurrence of the following, among other criteria: 1) four or more calls for police to the same service address or unit within a 30-day period when these calls relate to commission of crime under Arizona or federal law or otherwise report criminal activity or 2) commission of any two or more crimes under Arizona or federal law on the property that "negatively impacts the quality of life or

8

475486.1

threatens the safety and/or health in the area." **Exhibit A, Surprise Municipal Code §105-104.**

41.     The Nuisance Property Section authorizes Surprise to revoke or suspend a landlord's business license and/or charge the landlord with a civil or criminal violation if, after receiving notice that a tenant "allows" any nuisance offense to occur at the property, the landlord fails to take steps against the tenant to effectively abate the alleged nuisance violation.

42.     The Nuisance Property Section does not distinguish between perpetrators and victims of crime or between those who call the police frivolously and those who are in need of emergency assistance.

43.     The Nuisance Property Section states that notice will be given to the "responsible party," which it defines as the "owner, occupant, lessor, lessee, manager, licensee, or other person having control."

44.     However, after providing notice to the "responsible party," Surprise is not required to notify tenants about alleged nuisance offenses or any threatened or imposed penalty.

45.     In fact, the law does not require Defendants to provide notice of the law to tenants at any stage of enforcement, including when police respond to emergency calls from a home.

46.     The Nuisance Property Section does not give a tenant or occupant any opportunity to contest the decision to enforce the Nuisance Property Section against the property owner, landlord or property manager, or to contest the determination that various

475486.1

incidents at the property should be characterized as an "offense," justifying enforcement and resulting in harms to the tenant.

47.     On information and belief, Surprise has informed only property owners, landlords and managers of possible violations and threatened enforcement against them.

### The Crime Free Lease Section

48.     A related section of the Nuisance Policy, the Crime Free Lease Section, §105-106 requires all owners, managers or leasing agents in Surprise to include a lease provision that, on information and belief, permits them to evict tenants upon a single occurrence of any criminal activity, regardless of whether the tenant was the perpetrator or victim of that crime.  Thus, the Crime Free Lease Section requires landlords to adopt a lease provision that serves as a ready abatement measure to avoid any penalty under the Nuisance Property Section – namely, the eviction of the tenant residing in an alleged nuisance property.

49.     By mandating that landlords be prepared to take action against tenants whenever police respond to crime at the rental property and then imposing penalties on landlords if they fail to take action, Surprise established a statutory system that pressures landlords to penalize any instance of crime occurring at the property, even when the tenant is the victim of the criminal acts.

50.     Neither the Nuisance Property Section nor the Crime Free Lease Section references any relevant legislative authority granted to Surprise by state law.

### Conflict with State Law

51.     Arizona state law provides that no rental agreement may "waive or limit the tenant's right to summon or any other person's right to summon a peace officer or other

emergency assistance in response to an emergency."  A.R.S. §33-1315(A)(4).  The Nuisance Policy conflicts with this state mandate and cannot be lawfully enforced.

### Discriminatory Intent and Impact

52.    Before the Nuisance Property and Crime Free Lease Sections, as currently amended, were jointly passed in 2010, Surprise, including the City Council and Mayor, were warned by interested stakeholders that these provisions could be used to penalize victims of crime and would encourage discrimination by landlords.

53.    For example, in response to the proposed language, in June 2010, the William Morris Institute for Justice ("Morris Institute") submitted detailed concerns in a letter to the Mayor and City Council members about the potential impact of both the Nuisance Property and Crime Free Lease Sections, emphasizing the harms they posed to victims of domestic violence through its broad and undefined designation of nuisance offenses as including any crime that "negatively impacts the quality of life or threatens the safety and/or health of those in the area," and its coverage of any police calls for service.  **Exhibit B Letter from Ellen Katz, William E. Morris Institute for Justice, to Lyn Truitt, Mayor of Surprise, and Surprise City Council Members (June 24, 2010).**

54.    The letter warned that the Nuisance Property Section "may lead to discriminatory evictions," in particular "evicting or terminating the tenancy of a victim of domestic violence based on a domestic violence incident. . ."  **See Exhibit B**.

55.    The letter also put Surprise on notice that such evictions would amount to gender discrimination in violation of relevant Arizona fair housing law and the federal Fair Housing Act.  **See Exhibit B**.

475486.1

56.     In addition to the letter, at the June 2010 meeting of the Surprise City Council, a representative from the Morris Institute again voiced concern about the negative impacts of the Nuisance Property Section, stating that it would deter victims of crime from seeking police assistance and could penalize victims of domestic violence seeking law enforcement assistance against serious threats.

57.     The chair of Surprise's own Quality of Life Commission also expressed concern that the Nuisance Property Section could be enforced against, and lead to evictions of, domestic violence victims.  **Exhibit C, Video of June 24, 2010 City Council Meeting, available at**:

**http://surpriseaz.granicus.com/MediaPlayer.php?view_id=&clip_id=1584&meta_id=21665**.

58.     These predictions were well grounded because calls regarding domestic violence make up the largest category of calls a police department receives in many communities.[1]

59.     According to an article dated June 30, 2010 in the Arizona Republic, Surprise City Councilmember John Williams attempted to allay concerns about the use of the Nuisance Property Section against victims of crime and domestic violence victims in particular by assuring that "[e]nforcement of the new ordinance will be 'situational,' and the City will continue to encourage residents to report crimes and suspicious activity." **Exhibit D, copy of the June 30, 2010 Arizona Republic Article**.

---

[1] Andrew R. Klein, Nat'l Inst. Of Justice, Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors, and Judges (June 2009), http://www.nij.gov/topics/crime/intimate-partner-violence/practical-implications-research/Pages/welcome.aspx.

475486.1

60.    As demonstrated by Defendants' actions against Ms. Markham, those were empty words.

61.    The Surprise City Council passed the Nuisance Property Section at their June 2010 meeting without further consideration of, or any changes to, its language. No steps were taken to ensure that the rights and safety of victims of domestic violence and persons in need of emergency assistance were protected.

62.    The Morris Institute's June 2010 letter also expressed concern about the impact of the Crime Free Lease Section.  The letter noted that legal services advocates and civil rights groups had already identified crime free lease provisions as having been used to evict victims of domestic violence based on the violence perpetrated against them, and warned of their likely disparate impact on women who are disproportionately the victims of domestic violence.  **See Exhibit B**.

63.    The letter concluded that "requiring a blanket policy that landlords use crime free lease provisions opens up the door to violations of state and federal Fair Housing laws in cases where the tenancy is terminated on the basis that the tenant was a victim of domestic violence."  **See Exhibit B**.

64.    In the years before the Surprise Nuisance Policy was enacted, the Arizona Civil Rights Advisory Board (ACRAB) conducted public hearings on the use and effect of crime free lease provisions in 2006 and 2007, and subsequently publicized a letter outlining concerns with these provisions.  **Exhibit E, Letter from Jason Martinez, Chairperson of the Arizona Civil Rights Advisory Board, to Rebeca Flanagan, HUD Field Office Director, Terry Feinberg, Executive Director of the Arizona Multihousing Association,**

13

**Tim Zehring, Executive Director of the International Crime Free Association, and Susan Brenton, Executive Director of the Manufactured Housing Communities of Arizona (Apr. 10, 2007)**.

65.     ACRAB submitted this letter to the U.S. Department of Housing and Urban Development (HUD) and to several housing organizations in Arizona in April of 2007. **See Exhibit E**.

66.     The ACRAB letter noted that crime free housing programs that require the adoption of crime free lease provisions "may have a disparate impact on women and families with children who are victims of domestic violence," in which "such vulnerable people could lose their housing if a domestic violence incident occurs on the property or the abuser returns without the tenant's knowledge or permission."  The letter also warned that such provisions could be used as a pretext for underlying discriminatory actions and may also have a disparate impact on racial and minority groups. **See Exhibit E**.

67.     The June 2010 letter from the Morris Institute notified Surprise of ACRAB's concerns with crime free lease provisions and directed them to the ACRAB letter.  **See Exhibit B and Exhibit E**.

68.     Despite knowing the predicted consequences of the Crime Free Lease Section on women victims of domestic violence and crime victims, the City Council unanimously adopted this policy, together with the Nuisance Property Section, on June 24, 2010.

69.     Surprise publicly acknowledged ACRAB's concerns about crime free lease provisions in a 2012 "Analysis of Impediments to Fair Housing Choice" that it submitted to HUD, but again failed to actually address these serious problems.  **Exhibit F, Analysis of**

14

**Impediments to Fair Housing Choice, City of Surprise, Arizona, May 2012**.  Instead, Surprise recommended "use of existing institutional structure and partners to more effectively disseminate fair housing information."  On information and belief, Surprise has engaged in no education or outreach efforts about any possible negative impact of either the Nuisance Property Section or the Crime Free Lease Section of the Nuisance Policy on crime victims generally or domestic violence victims in particular.  **See Exhibit F**.

70.     Moreover, Surprise anticipated and continues to advertise to landlords and the public that the Nuisance Property and Crime Free Lease Sections comprising the Nuisance Policy work in tandem to deter tenants from seeking police assistance at their rental properties.

71.     Materials that the Surprise Police Department uses to promote the Nuisance Policy and train police officers and property managers link the operation of the crime free lease provisions to nuisance abatement efforts and characterize the Crime Free Lease Section and the Nuisance Property Section as new tools for addressing crime at a property.

72.     On its website, Surprise clearly articulates its intent to deter police calls in its recommendations that local landlords participate in its Crime Free Multi-Housing Program, of which the Crime Free Lease Section's requirement is "one of the key components." The website advocates the benefits of the program, stating that "[m]easurable results in the reduction of police calls-for service for properties participating in the Crime Free Multi-Housing Program have been seen nationwide. . . up to a 90% reduction in police calls for service."  **Exhibit G, Crime Free Multi-Housing Program, surpriseaz.gov, www.surpriseaz.gov/index.aspx?NID=1190 (last visited July 30, 2014)**.

15

475486.1

73.     Defendants, in internal training materials and publicly-distributed communications to property managers about the Nuisance Policy, also promote the use of evictions to abate criminal activity or police responses to a property.  Defendants not only encourage eviction pursuant to "offenses" under the Nuisance Property Section, but also characterize it as a proactive response to crime, possible under the crime free lease provisions that are in turn required by the Crime Free Lease Section.

### B. Ms. Markham's Rental Property and Lease

74.     Between March of 2013 and March of 2015, Ms. Markham rented the Property, where she lived with her two sons.

75.     Xiaoli Wang was the Property owner and Ms. Markham's landlord (the "Landlord").

76.     The Landlord employed Adam Botticello (the "Property Manager") from AZ Rental Homes to manage the Property.

77.     As required by the Crime Free Lease Section, Ms. Markham's lease included a "Crime-Free Provision" that stated that "[t]enant, occupants, family, guests, invitees, or other persons under the Tenant's control shall not engage in . . . any criminal activity, including . . . any act of violence or threats of violence . . . threatening or intimidating, unlawful discharge of firearms, or assault" and that any violation of this provision would be a material and irreparable violation of the lease.  **Exhibit H, Lease Between Xiaoli Wang and Nancy Markham for the tenancy of 15526 W. Ocotillo Lane, Surprise Arizona**.

16

475486.1

### C.  Domestic Violence Perpetrated Against Ms. Markham

78.     While living at the Property, Ms. Markham was the victim of domestic abuse perpetrated by her former boyfriend, R.V., on several occasions. This included violent attacks and threats to kill.

79.     R.V. is the father of Ms. Markham's minor child.

80.     From March of 2014 through August of 2014, officers from the Surprise Police Department responded to the Property on several occasions related to the domestic violence.

81.     During this time period, the Property was the site of four calls for police assistance in thirty days as well as more than two instances of criminal activity that threatened the safety of those in the area, either of which could trigger enforcement of the Surprise Nuisance Policy.

82.     Ms. Markham never called the police to the Property for any reason other than domestic violence, except for one occasion when she accidentally dialed 911 and hung up.

83.     She was not arrested for or charged with any crime at the Property.

84.     At no point in any of the responses to the Property did any Surprise police officer mention the Nuisance Policy or Nuisance Property and Crime Free Lease Sections to Ms. Markham, or inform her that repeated calls to the police or instances of criminal activity at the Property could result in her eviction or other penalty.

85.     Ms. Markham first requested police assistance from the Surprise Police Department at the Property on March 13, 2014 because of a threat to her safety.

17

475486.1

86.     After arguing with Ms. Markham through the night, early that morning, R.V. put his hands around Ms. Markham's neck, choked her repeatedly, and punched her in the mouth.

87.     R.V. left before the police arrived at the Property.

88.     Following this, Surprise police made visits to the Property to find and serve R.V. with a charge of aggravated assault stemming from the March 13, 2014 domestic violence attack.

89.     In March and April 2014, police responded on three other occasions when Ms. Markham called 911 for aid – once when she feared R.V. had returned to the Property and twice when R.V. was at the Property, threatening her and refusing to leave.

90.     In July and August of 2014, the Property was the subject of four police calls in thirty days – one call on July 22, two calls on July 31, and one call on August 1.

## July 22, 2014 Event

91.     On or about July 22, 2014, Ms. Markham's son let R.V. into the home to get some personal items that he had left there.

92.     R.V. and Ms. Markham began arguing and R.V. left, taking Ms. Markham's car without her permission.

93.     Ms. Markham called 911 to report the incident.

94.     Police officers responded to the call, which was coded as "domestic violence."

95.     The officers located the vehicle and spoke to R.V. He confirmed that he had argued with Ms. Markham at her home.

96.     The officers impounded the car, advised R.V. not to go back to the Property, and issued him a citation for driving while license suspended.

97.     Despite the open charges, the officers did not serve R.V. with the charge for aggravated assault from March 13, 2014.

### July 31, 2014 Events

98.     On or about July 31, 2014, R.V. ignored officers' instructions not to go back to the Property and arrived at Ms. Markham's home.

99.      R.V. argued with Ms. Markham, brandished a gun and refused to leave.

100.    Ms. Markham called the police at 8:39 p.m. and told the 911 operator that R.V. was refusing to leave the property and had a gun.

101.    When police responded, R.V. was already gone and Ms. Markham asked them to leave the Property.

102.    At approximately 11:06 p.m., Ms. Markham called 911 a second time to report that R.V. had returned to the Property and was trying to get into her locked residence.

103.    R.V. was armed with a shovel and still had the handgun on his person.

104.    Surprise police responded and arrested R.V.  They conducted a search of R.V. and found two syringes in his pocket.

105.    Police arrested and charged R.V. with disorderly conduct with a deadly weapon and possession of drug paraphernalia.

### August 1, 2014 Police Response to Ms. Markham's Home

106.    The next day, on August 1st, police again responded to the Property when a neighbor called to report that he had found a phone nearby that he believed belonged to R.V.

19

The neighbor described R.V. as the male who had been taken into custody by the police the night before.

107.   The neighbor stated that he found text messages on the phone from R.V.'s son.

108.   The phone was taken by the police and placed into safekeeping for R.V. to pick up when he was released from jail.

### D. Defendants' Enforcement of the Nuisance Policy Against Ms. Markham

109.   Under the direction of Defendant Frazier, the Surprise Police Department initiated its enforcement of the Nuisance Policy by having Defendant Tovar contact Ms. Markham's Landlord on August 4, 2014.

110.   Under the Nuisance Property Section's definition of a nuisance as a situation where a tenant "allowed" a nuisance offense to occur, the decision to pursue enforcement against the Property necessarily involved a determination that Ms. Markham should be held at fault for the domestic violence committed against her at the Property.

111.   Officer Tovar informed the Landlord that "serious criminal problems" were occurring at Ms. Markham's rental home and warned that the Property may be deemed a criminal nuisance under the Nuisance Property Section if the problems were not corrected.

112.   Officer Tovar sent the Property Manager formal notice of the four calls to police and criminal activity occurring at the rental home on August 6, 2014.  In addition to warning that the property could be deemed a criminal nuisance, the letter threatened the Property Manager directly, stating "should you fail to take reasonable steps to prevent future unlawful use of this property, you will not be considered an 'innocent owner/agent' in any

475486.1

future action with respect to this property." **Exhibit I, Letter from Chris Tovar, Crime Prevention Unit Surprise Police Department to Adam Botticello, Property Manager, AZ Rental Homes (Aug. 6, 2014)**.

113.   The Property Manager corresponded with Officer Tovar over the next week, and told Officer Tovar that he had no knowledge of any criminal activity at the property.

114.   Officer Tovar then shared a list of calls for police service to the Property.

115.   Defendant Tovar told the Property Manager that Ms. Markham's home was the subject of "numerous calls for various incidents," including three where officers arrested R.V.  **Exhibit J, E-Mail from Chris Tovar Crime Prevention Unit Surprise Police Department to Adam Botticello, Property Manager, AZ Rental Homes (Aug. 7, 2014)**.

116.    Tovar acknowledged that at least two of these arrests were for domestic violence-related charges and that Ms. Markham was the victim.

117.   On information and belief, the third arrest arose out of the July 31st domestic violence incident in which R.V. was charged with disorderly conduct with a deadly weapon and possession of drug paraphernalia.

118.   In this exchange, Officer Tovar told the Property Manager that Ms. Markham "was the listed victim in each of these cases; however she would sometimes be uncooperative with the officers upon their arrival." **Exhibit K, Chris Tovar, Officer Report for Incident 140803078 (Oct. 11, 2014)**.

119.   Upon information and belief, Officer Tovar incorrectly assumed in conversations with Ms. Markham's Landlord and Property Manager that R.V. was invited to

21

stay at the Property by Ms. Markham, rather than an unwanted perpetrator of domestic violence who Ms. Markham could not control.

120.    Likewise, a supplementary report to an April 2014 Surprise police response to the Property inaccurately described R.V. as Ms. Markham's "live-in boyfriend."  R.V. never lived at the Property.

121.    At no point did Defendant Tovar, Defendant Frazier or anyone else at the Surprise Police Department directed by Frazier, instruct or advise the Property Manager or Landlord that Ms. Markham should not be the subject of negative housing action or penalty on the basis of the domestic violence occurring at her home or related police calls.  Instead, Officer Tovar pushed for Ms. Markham's removal by discussing the possible legal grounds for evicting her from the residence with the Property Manager.

**Neighbors' Letter and Eviction Threat**

122.    On August 14, 2014, some of Ms. Markham's neighbors wrote a letter to Chief Frazier expressing concerns about the police responses to the domestic violence incidents at Ms. Markham's Property.

123.    The letter blamed Ms. Markham for the violence perpetrated against her, evinced significant animus against Ms. Markham as a victim of domestic violence and demanded action against her.  **Exhibit L, Letter from Residents of Ocotillo Lane to Michael Frazier, Police Chief Surprise Police Department (Aug. 14, 2014)**.

124.    The letter attracted police attention and Defendant Frazier demanded, in an email sent to Officer Christopher Tovar, among others, that someone at the department "take ownership of this issue. . . [and] keep me apprised as to the status of this situation."

22

475486.1

**Exhibit M, E-mail from Michael Frazier, Police Chief Surprise Police Department to Geoffrey Leggett, Criminal Investigations Commander Surprise Police Department and others (Aug. 18, 2014)**.

125.   On August 18th, Police Chief Frazier responded to the neighbors' letter and stated that there were already a number of actions in progress that were designed to abate the issue and that police "have a strategy in place that should result in a permanent solution, but it is still a work in progress."  Defendant Frazier indicated that Officer Tovar would be handling this issue, stating that he would contact the neighbors.  **Exhibit N, E-mail from Michael Frazier, Police Chief Surprise Police Department to April Irish (Aug. 18, 2014)**.

126.   As part of the "strategy" put in place by Defendant Frazier and in response to the direct contacts and threats made by Defendant Tovar to the Property Manager, on August 18, 2014, the Property Manager told Ms. Markham that "[t]he Surprise P.D. has put the owner in a position where they can no longer allow you to stay as a tenant."  **Exhibit O E-mail from Adam Botticello, Property Manager, AZ Rental Homes, to Nancy Markham (Aug. 18, 2014)**.

127.   The Property Manager told Ms. Markham that the Landlord would return her security deposit if she agreed to terminate the lease, but that if she did not voluntarily quit her apartment, the Landlord would pursue an eviction action against her.

**August 20, 2014 Event**

128.   On August 20, 2014, Ms. Markham again called the police to report a domestic violence incident and serious threat to her safety. R.V. was at the Property, intoxicated, refused to leave and waved a knife at her.

129.   Surprise police officers responded, arrested R.V. under the active warrant for aggravated assault relating to the strangulation incident on March 13, 2014 and charged R.V. with two counts of Assault, Police; two counts of Assault, Simple; two counts of Aggravated Injury; and Obstructing Justice.

130.   Ms. Markham subsequently obtained an Order of Protection against R.V. that same day.

**Defendants Continue to Push for Ms. Markham's Eviction**

131.   From late August through September 2014, Defendant Tovar continued to pressure the Landlord and Property Manager to take action against Ms. Markham pursuant to the Surprise Nuisance Policy.

132.   On information and belief, this was done pursuant to, and consistent with, the policies and practices of Defendant Frazier as Chief of the Surprise Police Department.

133.   On August 21, 2014, Officer Tovar requested information from the Property Manager on how his "contact with Ms. Markham turned out," inquiring into whether the attempts to remove her from the Property had been successful.  **Exhibit P, E-mail from Chris Tovar, Crime Prevention Unit Surprise Police Department to Adam Botticello, Property Manager, AZ Rental Homes, and Xiaoli Wang, Owner of 15526 W. Ocotillo Lane, Surprise, AZ (Aug. 21, 2014)**.

24

475486.1

134.   On that date, Officer Tovar informed the Landlord and Property Manager that Ms. Markham had again called the police regarding domestic violence for which R.V. was arrested.

135.   Officer Tovar also notified the Property Manager of the complaint letter that was sent by some of Ms. Markham's neighbors and demanded action against her.

**Defendants Discourage Any Alternative to Eviction**

136.   On August 26, 2014, Ms. Markham responded to the Property Manager's threat of eviction, assuring him in an email that the problems at her Property had been resolved because of the protection order against R.V. and because R.V. was now incarcerated.

137.   The Property Manager was receptive to this explanation and requested that Ms. Markham send him a police report to verify this, indicating his willingness to work matters out and not require Ms. Markham and her children to leave their home.

138.   On September 2, 2014, Defendant Tovar again contacted the Property Manager to confirm that he was proceeding to evict Ms. Markham and to remind him about the need for abatement of the nuisance, referencing an earlier phone conversation in which the Property Manager said he was giving Ms. Markham until the end of August to get out.

139.   In response, the Property Manager told Defendant Tovar that Ms. Markham had informed him that R.V., the cause of the disturbances, would no longer be able to return to the Property because he had been arrested and Ms. Markham had obtained an order of protection against him.

140.   The Property Manager asked Tovar if he could verify this information.

25

141.   While Officer Tovar confirmed that R.V. was arrested and served with an order of protection, he told the Property Manager that this was not an adequate solution. He noted a police report indicating that Ms. Markham had obtained an order of protection in the past but did not serve it on R.V..

142.   However, the police report cited by Defendant Tovar did not contain any discussion of a prior order of protection against R.V. and did not substantiate Officer Tovar's characterization.

143.   On information and belief, Defendant Tovar based enforcement of the Nuisance Policy, including his pursuit of Ms. Markham's eviction, on stereotypical notions about survivors of domestic violence.   Because Ms. Markham had already served a protection order against R.V., the only purpose for Officer Tovar's statement was to assert to the Property Manager that Ms. Markham, not her abuser, was responsible for the domestic violence perpetrated against her and was ultimately the cause of the so-called nuisance that must be abated.

144.   On information and belief, these views were consistent with attitudes conveyed to officers by Defendant Frazier in running the Surprise Police Department.

145.   Instead of affirming the Property Manager's belief that the problem was resolved given R.V.'s arrest and the order of protection, Defendant Tovar continued to urge that the Property Manager and Landlord evict Ms. Markham by suggesting that her eviction could be pursued on an alternative basis.

146.   Despite Defendants' coercive tactics, the Property Manager recommended to the Landlord that Ms. Markham be allowed to stay as long as an inspection showed that her

26

property was being maintained, noting that she had recently obtained an order of protection against the ex-boyfriend who was causing the problem and that the rent was paid.

147.   The Landlord then sought the views of the Surprise Police Department, under the direction of Defendant Frazier, and emailed Defendant Tovar on September 8, 2014 for his response to the Property Manager's recommendation.

148.   Defendant Tovar reported having a phone conversation with the Landlord that same day.  Tovar's report indicates that he did not disclaim his previous statements to the Landlord and Property Manager, which urged Ms. Markham's eviction on the basis of the domestic violence committed against her.

**Eviction Notice**

149.   On September 9, 2014, the Landlord directed the Property Manager to move forward with the eviction of Ms. Markham.

150.   On September 12, 2014, the Property Manager told Ms. Markham that the Landlord was not willing to let her stay and that she would be evicted in the next month if she failed to move before that time.

151.   Under Arizona Landlord Tenant Law, where there is a criminal breach of lease through criminal acts such as threatening, intimidating and assault, the landlord may deliver a written notice for immediate termination of the rental agreement. *A.R.S. §33-1368*.

152.   In response to Ms. Markham's request for a reason for the eviction, and her explanation that "[t]here was no criminal activity going on at [her] home, it was a domestic violence issue and [the abuser] was not living at the home," the Property Manager replied that he had no choice but to move forward. He acknowledged that: "[t]his is coming from

27

the city," which "has a law on the books where they can designate a home with a lot of police activity a 'public nuisance' or something else to that effect." **Exhibit Q, Email from Nancy Markham to Adam Botticello, Property Manager, AZ Rental Homes (Sept. 16, 2014) and Email from Adam Botticello, Property Manager, AZ Rental Homes, to Nancy Markham (Sept. 15, 2014); Exhibit R Email from Adam Botticello, Property Manager, AZ Rental Homes, to Nancy Markham (Sept. 18, 2014)**.

153.   The Property Manager suggested that Ms. Markham contact the Surprise Police Department for more information, explaining that "[b]asically they are threatening to deem the property a public nuisance." **Exhibit R Email from Adam Botticello, Property Manager, AZ Rental Homes, to Nancy Markham (Sept. 23, 2014)**.

154.   Based on the Property Manager's statements, Ms. Markham would be evicted on or soon after October 1, 2014.

### E.  Discriminatory Enforcement Based on Gender

155.   Blaming and stereotyping of domestic violence survivors, the majority of whom are women, as responsible for or contributing to the violence perpetrated against them is a form of discrimination that many women domestic violence survivors experience in their encounters with law enforcement.

156.   Officer Tovar demonstrated this kind of gender-biased policing practice in the statements he made to the Property Manager and Landlord, described above, as well as in his differing enforcement of the Nuisance Policy against male victims of domestic violence.

157.   Defendants enforced the Nuisance Policy against one residence involving male victims of domestic violence at a similar residential community in Surprise.

158.    Other than the sex of the victims, the activity that occurred at the other Surprise property was similar to that at Ms. Markham's home in all material aspects.

159.    The other Surprise rental property was the site of numerous calls for police aid and arrests for domestic violence and assault on October 21, 2012 and December 1, 2012, as well as other categories of police calls.

160.    Defendant Tovar was the Surprise police contact for this property and, as opposed to his persistent pursuit of the eviction of Ms. Markham and her children, he ultimately did not push for the eviction of all residents in the home.

161.    In this instance involving male victims, Defendant Tovar, who was, upon information and belief, acting consistently with the attitudes and policies of the Surprise police department under the direction of Defendant Frazier, approved the property owner's proposed abatement method of only removing one tenant whom the property owner identified as the primary source of the problem.

162.    Defendant Tovar did not require eviction of the other tenants who lived in that unit, including one man who had been a subject of the police responses for domestic violence and was assaulted by the tenant who was removed.

163.    Although the man was also charged with domestic violence-related crimes in these incidents, Defendant Tovar, and on information and belief Defendant Frazier and Surprise police department, allowed him to stay and made no assertion or determination that the remaining male victim had contributed to the incidents of domestic violence and thus should be removed.

475486.1

164.   Even though Ms. Markham's Property Manager suggested a similar method of abating any nuisance activity at her property, Defendants did not make a similar accommodation for Ms. Markham and her children.  This is particularly striking in light of Officer Tovar's acknowledgement that Ms. Markham was the victim in all the domestic violence incidents at her home and the fact that Ms. Markham was never charged with any criminal acts at the property.

165.   This disparate treatment on the basis of sex and on the basis of gender stereotypes that blame women victims of domestic violence for the abuse perpetrated against them violates constitutional and fair housing rights and ignores the well-being of women victims such as Ms. Markham.

## F.  The Harms to Ms. Markham and Her Children

166.   The actions by Defendants, in adopting and enforcing the Nuisance Policy, resulted in significant harms to Ms. Markham including loss of constitutional rights and violations of statutory protections, imminent loss of her and her children's home, as well as severe and ongoing emotional suffering and mental anguish.

167.   At all relevant times, the individual Defendants were acting pursuant to the policy and authority of the current Nuisance Policy enacted in 2010.

168.   As a result of each and every violation of law set out in the individual Counts, Ms. Markham has suffered loss of rights and safety, and great emotional distress.

169.   The continued existence of the Nuisance Policy after its enforcement against Ms. Markham as described above has resulted in a chilling effect on Ms. Markham's ability to call the police or seek law enforcement assistance in the future.  Based on her previous

30

experience, Ms. Markham reasonably fears that any future calls to the police will alert her new landlord to the Nuisance Policy and lead to her eviction.

170.   Ms. Markham has already declined to call the police when she otherwise would have and would not feel capable of doing so in the future, even if she believes that her safety and the safety of her children are threatened.   She is currently vulnerable to further violence because R.V. was recently released from prison.

171.   This chilling effect on her speech and her predictable hesitancy to contact public agencies, in light of her experience with Surprise officials and law enforcement, has caused an ongoing loss of her fundamental First Amendment rights of speech and to petition the government.

## G.  Notice to Surprise

172.   Ms. Markham, through her undersigned counsel, sent Defendants a letter on October 2, 2014, notifying Defendants of the unlawfulness of Defendants' actions under the Nuisance Policy and that enforcement of this policy violated Ms. Markham's constitutional rights and federal housing law.  The October 2, 2014 letter demanded that Defendants cease enforcement of the Nuisance Property Section against Ms. Markham and Ms. Markham's Landlord and suspend all enforcement of the Nuisance Policy in Surprise. **Exhibit S, Letter from Michaela Wallin, Equal Justice Works Fellow, ACLU Women's Rights Project, Sandra Park, Senior Staff Attorney, ACLU Women's Rights Project, and Dan Pochoda, Legal Director, ACLU of Arizona, to Sharon Wolcott, Mayor of Surprise, Arizona, and Bob Wingenroth, City Manager of Surprise, Arizona (Oct. 2, 2014)**.

173.    Defendants responded by denying they had taken any action either against Ms. Markham or the Landlord to abate the "nuisance" at the Property.  Defendants claimed that they recommended that the Landlord "not terminate the lease agreement relative to the domestic violence incidents."   However, they did not address Officer Tovar's repeated discussions of Ms. Markham's eviction with the Landlord and Property Manager, all of which was due to the domestic violence and police calls to the Property.  **Exhibit T, E-mail from Lieutenant Harold Brady, Public Safety Legal Advisor, Surprise Police Department, to Michaela Wallin, Equal Justice Works Fellow, ACLU Women's Rights Project, and Sandra Park, Senior Staff Attorney, ACLU Women's Rights Project (Oct. 6, 2014)**.

174.    Defendants did not respond to the request to suspend enforcement and made no assurance that the Nuisance Policy would not be enforced against Ms. Markham or the Landlord at a later date.  Defendants did not even indicate that Ms. Markham would not be sanctioned for reported crimes against her or calls for police assistance when she was the victim of domestic violence.

175.    Ms. Markham's counsel also contacted the Landlord and Property Manager to inform them that the threatened eviction was unlawful and that other negative housing action on the basis of incidents of domestic violence or Ms. Markham's status as a victim of domestic violence would be unlawful.

176.    Ms. Markham received no initial response from the Landlord or Property Manager regarding whether they would continue to pursue her removal from housing.

32

177.   Eventually, upon further correspondence with Ms. Markham's counsel, the Property Manager stated, on December 3, 2014, that there was no pending eviction or legal action against Ms. Markham coming from our office.

178.   On March 5, 2015, Ms. Markham submitted a Notice of Claim to Surprise, the Surprise Arizona Police Department, Police Chief Michael Frazier, and Officer Christopher Tovar.

## H.  Injunctive and Declaratory Relief

179.   Adoption and enforcement of the Nuisance Policy by Defendants has caused and continues to cause irreparable harm to Ms. Markham, including by chilling her First Amendment rights to free speech and to petition the government and by violating her Fourteenth Amendment rights to Due Process and Equal Protection and her rights under the federal Fair Housing Act and state law, as described above.

180.   Ms. Markham has suffered and will continue to suffer irreparable harm unless this Court permanently enjoins Defendants from enforcing the Nuisance Policy.

181.   Absent injunctive and declaratory relief, Ms. Markham and other crime victims in Surprise face the very real threat of losing their homes if they contact the police for help.

182.   The policies and practices of Defendants have caused and continue to cause a serious threat to the safety and well-being of such victims, including Ms. Markham.

183.   Defendants' actions continue to result in a significant chilling effect on the exercise of Ms. Markham's, and other Surprise tenants', free speech rights and their ability to seek the assistance of law enforcement.

184.   Ms. Markham has no adequate remedy at law.  Unless enjoined by the Court, Defendants will continue to infringe Ms. Markham's rights and those of Surprise residents who require or seek police or emergency assistance, and continue to inflict irreparable injury.  This threat of injury to Ms. Markham requires preliminary and permanent injunctive relief in which Defendants are enjoined from enforcing the Nuisance Policy against her and other residents in Surprise.

**COUNT I – Rights of Speech**

**(U.S. Const. amend. 1; Ariz. Const. Art. 2 §5)**

185.   Ms. Markham incorporates by reference the allegations in the preceding paragraphs as though set forth at length herein.

186.   The First Amendment to the United States Constitution and its Arizona equivalent, Ariz. Const. Art. 2 §5, guarantee the right to freedom of speech and the right to petition the government for redress of grievances.

187.   Under the First Amendment's "right to petition" clause, communications to law enforcement – including (1) reporting physical assault, (2) reporting criminal activity, and (3) filing a complaint with law enforcement – are constitutionally protected activities.

188.   The First Amendment also prohibits restrictions on the expression of information or speech, including prohibitions on reporting crime or requesting police service.

189.   The language of the Nuisance Property Section violates the First Amendment on its face by imposing penalties on the basis of calls to the police or reports of criminal activity.

34

475486.1

190.    The Nuisance Property and Crime Free Lease Sections also chill the exercise of First Amendment rights by imposing penalties on the basis of crime occurring at a property, regardless of whether the tenant was the victim or perpetrator, and thereby deterring and outright burdening tenants' ability to report crime and seek police assistance.

191.    The Nuisance Property Section further violates the First Amendment as applied in Defendants' enforcement of it against Ms. Markham.

192.    Defendants' enforcement of the Nuisance Property Section against Ms. Markham based on calls made to the police reporting violent harassment and instances of domestic violence perpetrated against her directly violated her right to petition the government to redress grievances and to freedom of speech.

193.    The continued existence of the Nuisance Policy has prevented Ms. Markham from calling the police because of the impact it could have on her housing. Ms. Markham has declined to call 911 when she otherwise may have and would avoid contacting the police in the future.

194.    Thus, the Nuisance Policy and Defendants' aggressive enforcement of it has created an undue burden and chilling effect on Ms. Markham's First Amendment right to free speech and to petition the police for protection.

195.    The Nuisance Policy, particularly as applied to victims of crime or those in need of emergency assistance, does not advance any compelling government interest and is not narrowly tailored to justify the infringement of Ms. Markham's fundamental right to call the police.

35

196.   Accordingly, the Nuisance Policy violates the First Amendment and its Arizona equivalent.

197.   Therefore, Ms. Markham requests the relief outlined below.

**Count II: Procedural Due Process**

**(U.S. Const. amend. XIV; Ariz. Const. Art. 2 §4)**

198.   Ms. Markham incorporates by reference the allegations in the preceding paragraphs as though set forth at length herein.

199.   The Fourteenth Amendment to the United States Constitution and its Arizona equivalent provide that no person shall be deprived of life, liberty or property without due process of law.

200.   Enforcement of the Nuisance Property Section threatened to deprive Ms. Markham of her property interest in her leasehold by subjecting her Landlord to potential criminal fines or revocation of her rental license and by directing and incentivizing her Landlord to initiate eviction proceedings against her without adequate procedural protections.

201.   On its face, the Nuisance Property Section does not require any notice to the tenant when the Section is enforced against property owners, nor does it give the tenant an opportunity to contest either the discretionary decision to characterize an incident as an "offense" or the decision to enforce the Nuisance Property Section against the Landlord.

202.   Defendants did not afford any procedural protections to Ms. Markham as they made their decisions and took actions to ensure that she suffered penalties including eviction.

36

203.   Accordingly, the Nuisance Property Section and its enforcement by Defendants violate the Fourteenth Amendment Procedural Due Process Clause and its Arizona equivalent.

204.   Therefore, Ms. Markham requests the relief outlined below.

## Count III: Equal Protection

### (U.S. Const. amend. XIV; Ariz. Const. Art. 2 §13)

205.   Ms. Markham incorporates by reference the allegations in the preceding paragraphs as though set forth at length herein.

206.   The Fourteenth Amendment to the United States Constitution and its Arizona equivalent prohibit the denial of equal protection of the law.

207.   Defendants intentionally discriminated against women by chilling the ability of women victims of domestic violence to report crime and seek police protection and by penalizing women victims for seeking police assistance.

208.   The City Council enacted the Nuisance Property Section and the Crime Free Lease Section with the knowledge and intent that they would adversely impact domestic violence victims' ability to seek police assistance and maintain their housing.

209.   The City Council had knowledge of, but disregarded, the warnings of local stakeholders, including a representative from Surprise, about the harmful impact the Nuisance Property Section and Crime Free Lease Section would have on women, especially women victims of domestic violence.

210.   Moreover, the Police Department's application of the Nuisance Property Section against women domestic violence victims relied on gender stereotypes about abused

37

women to justify its action, blaming women victims for the criminal conduct perpetrated against them.

211.   Officer Tovar, the primary official who enforced the Nuisance Property Section, also treated Ms. Markham less favorably than a similarly-situated male victim of domestic violence and did so based on the same gender stereotypes about abused women's responsibility for the violence committed against them.

212.   The disparate enforcement of the Nuisance Property Section against women intentionally discriminated against female tenants in Surprise, such as Ms. Markham, who are victims of domestic violence.

213.   Ms. Markham was injured by the discriminatory enforcement of the Nuisance Property Section because she could not seek police assistance without risking being evicted.

214.   Enforcement of the Nuisance Property Section in situations where residents seek emergency or police assistance or are the victims of crime does not advance an important or legitimate government interest, and is not substantially or rationally related to advance such an interest.

215.   Accordingly, Defendants violated and continue to violate the Fourteenth Amendment and its Arizona equivalent.

216.   Therefore, Ms. Markham requests the relief outlined below.

## Count IV: Discrimination in Housing on the Basis of Sex

### (Fair Housing Act, 42 U.S.C. §§3601 *et seq.*; Ariz. Rev. Stat. §41-1491)

217.   Ms. Markham incorporates by reference the allegations in the preceding paragraphs as though set forth at length herein.

475486.1

218.    The Fair Housing Act and its Arizona equivalent prohibit discrimination in housing on the basis of any protected class, including sex, and further prohibit any law that purports to require or permit any action that would constitute a discriminatory housing practice or has a disparate impact on a protected class.

219.    Ms. Markham was a victim of domestic violence. The great majority of victims of domestic violence are women, a protected class recognized by the Fair Housing Act and its Arizona equivalent.

220.    Defendants interfered with Ms. Markham's housing on a discriminatory basis, otherwise making housing unavailable to her and discriminating in the provision of services or facilities on the basis of sex.

221.    Defendants made housing unavailable to Ms. Markham pursuant to the Nuisance Policy by pressuring her Landlord to evict Ms. Markham based on the domestic violence committed against her and predicated on inaccurate gender stereotypes about women victims of domestic violence.

222.    Defendants discriminated against Ms. Markham in the provision of services by enforcing the Nuisance Policy to penalize Ms. Markham for seeking police services in response to incidents of domestic violence.

223.    Defendants' acts and decisions in enforcing the Nuisance Policy against Ms. Markham, as described above, demonstrate their discriminatory animus against women victims of domestic violence.

475486.1

224.   The City Council knowingly disregarded local stakeholders' warnings about the harmful impact the Section would have on women victims of domestic violence and the likely Fair Housing Act violations that would result.

225.   The Surprise Police Department relied on gender stereotypes about abused women in justifying police action against Ms. Markham and more aggressively enforced the Nuisance Property Section against her as compared to a similarly situated male.

226.   Defendants engaged in such discriminatory conduct intentionally, willfully, and with disregard of the rights of Ms. Markham, and she suffered injury as a result.

227.   Accordingly, the Nuisance Property Section violates the Fair Housing Act and its Arizona equivalent.

228.   Therefore, Ms. Markham requests the relief outlined below.

### Count V: State Preemption

229.   Ms. Markham incorporates by reference the allegations in the preceding paragraphs as though set forth at length herein.

230.   The Nuisance Policy intrudes on a matter of statewide concern: the ability of residents to call the police and/or receive police assistance in an emergency or in the face of criminal activity.

231.   The Arizona Legislature has appropriated the field by enacting A.R.S. §33-1315(A)(4), which provides that no rental agreement may "waive or limit the tenant's right to summon or any other person's right to summon a peace officer or other emergency assistance in response to an emergency."

40

232.   The Nuisance Property Section directly conflicts with A.R.S. §33-1315 by imposing penalties and prohibiting a property owner, agent, or manager to rent or continue to rent "to a tenant following "[f]our or more calls for police service to the same service address/unit within a 30-day period . . . reporting criminal activity."

233.   The Nuisance Policy also conflicts with §33-1315 by imposing penalties and requiring or encouraging a property owner, agent, or manager to evict a tenant upon crime occurring at the property, even when the tenant was the victim of that crime.

234.   The Nuisance Policy effectively imposes strict liability on tenants for crime that occurs in their homes and thereby impermissibly limits a tenant's statutory right to seek police assistance in response to that crime.

235.   The Crime Free Lease Section extends the tenant's responsibility without any meaningful limit, instead requiring that the tenant "not allow criminal activity within the tenants [sic] sphere of influence," a vague, overly broad term that is found nowhere in the Arizona Residential Landlord Tenant Act.

236.   Similarly, although the Nuisance Property Section defines a nuisance as based on crime that the tenant "allows" on or near the property, in operation it imposes penalties based on crime over which the tenant has no control, such as violent assaults by an abuser against a victim of domestic violence.

237.   With the backdrop of the Crime Free Lease Section's requirement that all leases in Surprise authorize eviction based on a single instance of criminal activity and Defendants' aggressive enforcement of the Nuisance Property Section based on instances of crime, tenants are necessarily chilled and restricted in their ability to seek police protection.

41

238.   The Nuisance Policy and its enforcement violate Ms. Markham's statutory right to seek police assistance in an emergency situation like the domestic violence incidents described above.

239.   Additionally, Surprise does not have a charter and thus must be able to point to a provision of state law to justify any local legislation. Non-charter Arizona cities, like Surprise, derive their legislative powers from the state constitution and statutes.

240.   Surprise exceeded its legislative authority when it enacted the Nuisance Policy because there is no provision of state law or the constitution that grants cities the power to limit calls for police service, to punish a landlord or tenant for making such calls, or to impose penalties based on the occurrence or reporting of crime without regard to whether the person punished was the perpetrator or otherwise responsible.

241.   Neither the Nuisance Property nor Crime Free Lease Sections cite to any state law granting the supposed legislative authority being invoked.  Other sections of Chapter 105, Article III do contain state law references.

242.   Therefore, Ms. Markham requests the relief outlined below.

WHEREFORE, Ms. Markham prays for judgment on Counts I – V as follows:

1.   Ms. Markham requests a declaratory judgment and order for permanent injunctive relief under (a) Federal Rules of Civil Procedure 57 and 65, (b) 28 U.S.C. §2201(a), and (c) any "further necessary or proper relief" under 28 U.S.C. §2202;

2.   Ms. Markham requests a declaration that the Nuisance Policy violates the United States Constitution, Fair Housing Act, Arizona equivalents, and other state legal provisions as set out above;

42

3.      Ms. Markham requests entry of a permanent injunction enjoining the Defendants, acting in their official capacities, and all others under their supervision and control, and those acting in concert with them, under color of the law of the State of Arizona, from enforcing the Nuisance Property and Crime Free Lease Sections;

4.      Ms. Markham requests an award of her compensatory and punitive damages;

5.      Ms. Markham requests an award of the costs and expenses of this action, including attorneys' fees pursuant to 42 U.S.C. §1988(b) and 3613(c); and

6.      Ms. Markham requests any further relief that the Court determines may be just or equitable.

DATED this 27th day of August, 2015.


By /s/ Heather A. Macre
    Heather A. Macre
    Aiken Schenk Hawkins Ricciardi P.C.
    2390 East Camelback Road, Suite 400
    Phoenix, Arizona  85016-3479
    *Attorneys for Plaintiff*

43

475486.1

**<u>VERIFICATION</u>**

State of Arizona           )
                          )
County of Maricopa )

I, Nancy Markham, hereby declare that I am the Plaintiff in the attached matter, *Markham v. City of Surprise et al.*, and that I have read the foregoing Complaint, and that I know of the contents thereof; that the same are true and correct to the best of my belief, except as to those matters alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 25th day of August, 2015.


/s/ Nancy Markham
Nancy Markham

44

475486.1